First case up this morning is 4-12-0-9-9-7 Garrelts v. Lots of Folks, and apparently the time, Mr. Wilder, you're here on behalf of the Pellon. Is this fair to have four people arguing against you, Mr. Wilder? Okay, well, apparently the time has been divided up. Mr. Clerk, you have these times done? Okay, so Mr. Simpson is going to have seven minutes. That's you, sir. Mr. Heft, is that pronounced correctly? Heft. Okay, Mr. Fisher has three minutes, and Mr. Pollard has eight minutes. Correct. And it's going to be, if this is correct, Mr. Pollard, Mr. Fisher, Mr. Simpson, Mr. Heft. Okay, I think I have my marching orders and the scorecard in front of me, and accordingly, Mr. Pollard, you may proceed. Excuse me, I've already made that mistake. Mr. Wilder, you may proceed, sir. Excuse me. Good morning, Jim Wilder, on behalf of the Pellon, Carolyn Garrelts. As Justice Steigman mentioned, there's a lot of defendants, there's a lot of issues, and I don't anticipate trying to address all the issues in the briefs. If I don't address something that's in the briefs, it's not because I'm waiving it out, I just rely on what's in the briefs. Of course. And I will try to divide it into two parts. I want to address the summary judgments that were made for the conspiracy defendants, and we're asking those be reversed. And we're asking for a new trial, as to John Crane, because of an evidentiary error. The first thing I want to address is the issue of whether the trial court employed the correct standard of proof in rendering summary judgment for the conspiracy defendants. The trial court basically made statements that a plaintiff has to prove by clear and convincing evidence or establish a conspiracy by clear and convincing evidence, which is true for a circumstantial conspiracy during the trial, but this was the first time, at least in my experience, that a trial court had employed the innocent construction rule at the summary judgment stage. And the plaintiff submits in its brief that that's inconsistent with the longstanding summary judgment law, whether it be from this court for the last half century or from the 2012, where it says that summary judgment should not be granted unless a moving party's right to judgment is clear and free from doubt, if the undisputed material facts could lead reasonable observers to divergent inferences, or where there is a dispute as to material facts, summary judgment should be denied. That's for the jury to decide. I understand where we're at, apparently with clear and convincing evidence and inferences at the J&OB stage. Not surprisingly, I don't agree where we're at, but I understand where we're at. But I think this court, with some of its recent decisions on the judgment J&OB stage, has sort of, in the plaintiff's view, altered the law as to what it has been, and it's a different analysis. I think Justice Turner, in his concurrence in the Vinson case, said that we were concurring because the majority of the court had adopted a sufficiency of I don't know exactly what he meant by that, but I have a feel for what I think is occurring in the judgment of these, which is something different than what was suggested in April v. Gustafson. I'm not here to re-argue those today, but I'm saying this seems to be an issue of whether it's going to be taking a further step. Say, at the summary judgment stage, the plaintiff's going to have to start proving the case, or we're going to apply the clear and convincing standard. The trial court said that the clear and convincing standard was implicated based upon the first district decision of Lozman, or Lozman, however it said, and as we pointed out, had argument from the trial court. And in our briefs, Lozman was a case where there was an issue of clear and convincing, but when it went up on appeal, the plaintiff, for whatever reason in that case, briefed only one thing, which was a new issue that had never even been raised at the trial court. And the appellate court said the clear and convincing issue, you know, at summary judgment, isn't before us because plaintiff has got this new issue, and we find out, we hold plaintiff way back because they never give, the plaintiff never gave the trial judgment. Let me ask you this, Mr. Buehler. Isn't it a correct statement of the law that the Illinois Supreme Court and other courts have tended to deem as essentially equivalent the situation where the question before the court on the one hand, on a motion for summary judgment, is essentially the same as the question that would be before the court on a motion for directed verdict at the conclusion of the evidence in a jury trial, or motion for judgment will be after a jury trial, where is, is there any genuine issue of material fact, number one, moving party entitled to judgment is a matter of law. If that's the case, and I think it's the case, why shouldn't the standard for summary judgment be the same as it would be for judgment NOV or motion for directed verdict? Namely, if there's a higher burden of proof upon the plaintiff than just by preponderance of the evidence to apply the same burden when evaluating both of those motions, or all three, essentially, as being essentially the same. Well, the test, I think, is similar, although I would suggest the case law on summary judgments has been more non-movement favorable, if you will, and as I say in the pilot case, the court, and that's not a clear and convincing case, but it reiterates what this court, I'm sure everybody on this panel has probably said at one time or another, and as to the use of the clear and convincing standard at the summary judgment level, the defendants cite to Ray Dancer, a case that's been cited in this court over and over, probably over the last 15 years in these cases, but as we pointed out in the briefs, Ray Dancer has not, it hasn't been overruled, and there's a retreat from it. No one's really discussed, I think, explicitly this same point, and it seems to me, being more explicit about it, what we're doing is incorporating into this analysis the greater burden of proof. Isn't that essentially what's going on? That is, in deciding whether there's a genuine issue of material fact, whether the party, moving party, is entitled to judgment as a matter of law, we are saying, and by the way, trial court, when you are so evaluating, you should do so in the context that the burden is on clear and convincing evidence to establish the settlement on the plaintiff. Why shouldn't we do that? Well, because it would seem to be contrary to existing summary judgment law that the plaintiff doesn't have a burden as a non-movement, and I realize you mean... No, no, I'm not the burden. I may or may not be speaking clearly. It's true the plaintiff is the non-moving party, doesn't have the burden to establish the argument in support of summary judgment. That's not what I meant. In evaluating whether there's a genuine issue of material fact or whether the moving party is entitled to judgment as a matter of law, why shouldn't the overall burden which the greater clear and convincing evidence as opposed to a mere preponderance be considered? It can be considered, but I don't think it becomes the plaintiff's burden, and that's why we filed for funding. And what it leads to, Judge, is at the judgment OMB level, this court has been applying, and the McClure Supreme Court applied, the innocent construction rule, which is if there's any inference out there that's good that could be innocent, then that's the one that apparently gets drawn. So if you use that at the summary judgment level, then the defendant moves for summary judgment, says the burden is clear and convincing, going to be clear and convincing at the end of the trial, so all we've got to do is come up with an innocent explanation. And unlike all summary judgment law, it says you draw inferences in favor of the non-moving, you select, which is what I believe the trial court did here, you select the one inference good for the movement. No, I think it would be more a matter of evaluating the evidence in the context of the burden. Let me give you an example. In criminal cases, standard of proof, burden on the state is proof of guilt beyond a reasonable doubt. If a defendant's been convicted, or, you know, we're all, we've been trial judges, and at the end of the state's case in a criminal case, motion for directed verdict, the question is, could any reasonable juror, viewing this evidence in light most favorable to the state, conclude that the state has proven the charge against the defendant beyond a reasonable doubt? Now, the reason I mention that is because this standard, and it would be the standard for judgment on a beta criminal case, incorporates this higher standard of evidence, which the In other words, it's not just, could the jury find in favor of the state? Oh, it's could the jury find in favor of the state beyond a reasonable doubt? Similarly, when evaluating a motion for directed verdict, plaintiff's case, should the trial, trier fact think, viewing this evidence in a light most favorable to the non-moving party, has the non-moving party met this greater burden of proof? At the directed verdict stage, that's what's occurring, and I think it's more than that, it's being weighed, but early in that question, you mentioned why not evaluate. I think, and I don't know, I'm not a morning person, so it's a slow, medical negligence case in Logan County that Judge Lawrence was nice enough to recess this morning, so. But I think the trial court, if it starts having to choose inferences, determine what's innocent and not, if the summary's judgment stage is in effect weighing or evaluating the evidence, which seems to be contrary to summary judgment law, but the trial court's not supposed to be weighing or evaluating the evidence, we're not supposed to have a trial by paperwork, which is what it turns into and how it's different from directed verdict. We suggest the trial court employed the wrong standard, and I'd like to move on to the next issue. Sure, go ahead. The next issue is, whichever standard was used, should summary judgment be granted on the record? First, as to Honeywell, I'll stand on the briefs. I'm convinced that, frankly, absent a notarized agreement, I'm not going to get a verdict sustained as to Honeywell, probably, so I'm not going to spend my 20 minutes on it. For what it's worth, I still believe Dukes 1 is a correct analysis. I realize Radarmo said that Dukes 1 was not logical and made no sense in some ways, and I realize the author of Dukes 1 has since, in order, adopted Radarmo, but I still think the author was correct in Dukes 1, and his analysis was correct, and so I think Honeywell should have lost. Now, as to ABECs, I'm suggesting summary judgment should not have been allowed, because even under Radarmo, and I don't agree with Radarmo, but you are the 4th District, and under Radarmo, paragraphs 124-128, Justice Appleton and Justice McCullough, Justice Turner said it was a household case, which is what we argue with orals. The Radarmo court said, the majority, said under 124-128, you need a qualified expert opinion or you need evidence that stuff is publishable, because otherwise it's not a tort. And I argued with you down here in Minson in front of some of you, that the idea that it needed to be a tort misunderstands basic premises of conspiracy law, because not every overt act has to be a tort. Every overt act furthers a conspiracy. There has to be a tort committed, selling without warning, employing without warning, but not every overt act has to be a tort. But even if Radarmo's right on that point, you need a qualified expert, you need evidence that it's publishable, we have put that evidence in this record. We've disclosed, and Dr. Arthur Frank was the post. He's been writing on asbestos for 40 years from Mount Sinai, and he said it was, whether it was cancer or non-cancer, the fact that the animals got abnormal lesions was scientifically important. So that's a genuine issue of material fact created by that, even in the Radarmo test. We also have in the record, it actually bears a number, ABEX 711. It's a contemporaneous writing back in the 40s. And to put it into perspective, in Plans Exhibit 400A, the letter from February 1943 from Gardner to the sponsors, he attaches his monograph that contains the references to cancer, cancer in the mice. And he says since it will take two or three years for an additional study, the study should be omitted from the present report. But he attaches the monograph of what he's going to publish. And I realize this court, a number of opinions ago, went the wrong way on that and said actually he said, you know, I'm not going to publish it. But if you read his cover letter, it's not what he's saying. The study should be omitted, future study. The monograph, earlier he says this is my conclusion of what I'm going to publish on. That's the monograph on experimental asbestosis. So Gardner dies October of 1946, unexpected. Saranac is being pushed to publish and they send all of his papers to Ken Lynch, Dr. Ken Lynch, one of the first, I think the first author to publish in the medical literature in America on asbestos and cancer in 1935. Lynch writes back February 21 of 1947 saying he's too busy to edit all of this stuff and there's a lot of work needed on some of it, but the monograph on experimental asbestosis is valuable and publishable as it stands. Just an introduction. Now that's a contemporaneous writing at the time saying this was publishable. Neither of those things were in Redarmo. And those two things as to why there was an issue of fact even under Redarmo. I say that. We also attached our reply brief, a decision by a federal district court. It's a court that oversees the MDL litigation on asbestos, Judge Rebrano, and he denied ABEX's motion for summary judgments. In the Ellis case, which is just one of our files that got removed to federal court, he denied it and said in Redarmo, and he quotes from Redarmo about the need for a qualified expert opinion, and he says that this is the evidence that the Redarmo court noted was missing and on which his decision turned. He quotes from Redarmo and says Frank's in this case. This is evidence that meets the Redarmo test. He also mentioned Minson, and I don't mean to diminish Minson, but in Minson the court wrote the Redarmo analysis, and then I think in paragraph 50 said without more, you know, Redarmo is on this. We have more ABEX in this case. I mean, even if I don't agree with an opinion, I go out and try to meet whatever test it says, and we've got Frank's deposition. We've got the letter from Lynch. That's evidence that creates a genuine issue of material fact as to whether Saranac was publishable. One from 1947, one from a retained expert, yes, but of course when Pratt testified, which is quoted at length in Redarmo, Pratt was testifying as a retained expert for ABEX in a case called Scherer in Bloomington back in 1996. So there is a genuine issue of material fact as to ABEX even under the Redarmo test. Going to OI, and I'll try to be brief because Mr. Pollack is waiting to go first for Crane, so I better get to him. As to OI, again, we attached a number of exhibits and a great many exhibits that were never in McClure. That was the majority of what we responded. In Gillenwater, which I became aware of at 6 o'clock last night, and read about 11 at the time of that case, but in Gillenwater, this court basically, as I read it, said that OI was in a conspiracy, 53 to 58, with Owens Corning. That discussion occurs in paragraph 99 and the following paragraphs. Charlie Gillenwater being exposed to 72. In this case, Carolyn's exposure doesn't start until 63. What Gillenwater doesn't discuss, though, is, and there's no mention, and it was in the Gillenwater record, it's in this record, is all of the evidence of why OI was motivated to be in a conspiracy and was motivated to not have the risk of asbestos told after 1958. And that's the testimony of their then-CEO, when I deposed him, I think it was 2003, Joe Limier. That's all of the exhibits. Because OI could not make their glass products without asbestos in its factories, because they didn't know how to do that in the 60s and the 70s. OI had asbestos insulation in its factories, including Kalo. They couldn't make bottles without asbestos in the 60s and 70s. There's even indications clear into, in the 80s, they still had to use asbestos in some applications. And they did not tell their workers until 74, according to Limier, who was the CEO at the time, he was saying he was the guy who started out in the 50s and worked his way up and was into glass plants in the 60s and 70s. And the first OI asbestos policy came out in the summer of 74, and he sent a teletext August 1 of 74 to all the glass plants saying, we have a serious problem here with asbestos, tell me how you're using it, and so on. So OI still needed to use asbestos, and they were still motivated. That's in the Gillenwater record, it's not in the Gillenwater opinion. Gillenwater just stops at 1958, but I would take issue with the idea that OI wasn't interested in the use of asbestos after 58. They were, because for the same reason that Gillenwater says, 53 or 58, that OI was a conspiracy, that same reasoning would apply as to why that OI doesn't want to get out if nobody would use Kalo, that same reasoning applies. John Crane, two issues. One, exposure after 1980. Herzog says that you can't, that's when Carolyn's exposure ended, we could not put in any evidence of what Crane did after 1980. Herzog says that's true unless the defendant tries to say it's the safest possible product. Crane actually said it's incapable of causing disease. Throughout the trial, they said that, which is even beyond safe as possible, so it was certainly relevant that they put warnings on. The door was even opened further when their corporate representative, I asked him before 1980 was there a warning, and he said, and this was their corporate rep, we didn't warn until 83. And then when I tried to follow up on that, the court said no, you can't follow up as to the fact they put a warning on in 83 or what it said. So the door was opened there, but the door should never have been closed in the first place when they're saying it can't even cause disease, and yet in 83 they're putting warnings on that says it can cause disease. The second issue as to Crane is the Al Gerald step, which was the first thing Crane mentioned in closing. Carolyn and Al divorced. It wasn't amicable. They had no contact. He was down in Texas. He talked to my partner and said, yeah, I use gaskets. Carolyn's a take-home case. 63 to 79 is to Al, I use gaskets. I cut them. They were there. Between that conversation and when we went down to do his discovery death and his evidence death, he was called by defense attorneys. It wasn't any of these, but he called by them and told, your wife's suing you up here. Isn't that significant, though, that it wasn't any of the attorneys? It's significant in terms of it's good for them, they didn't engage in that conduct, but it still doesn't affect the fact that Al, after he's called and is being told he's sued, Wasn't his earlier statement brought out to the jury? Didn't they have a chance to hear it? Yes, it was. Go ahead. It was, but it could be he had a different recollection or a different memory for a variety of reasons the more he thought about it. Actually, he had a different recollection. Not recollection, he had a different testimony because he was upset and scared that he thought his next wife was suing him. Did that come out to the jury, too? No, that was edited out of the deposition, and that's what we say should have been edited in for bias and interest. It could have been handled saying, wasn't these guys, there's nobody suggesting it was John Crane's attorneys, but instead they had this ex-husband who says, yeah, I said that once, but today I'm saying I didn't. They didn't know. This ex-husband said, yeah, I said that once, and then I found out wrongly that I'm being sued, so now I'm saying I didn't. Well, that's your connection, though, that he's saying, now I'm saying it, even though his testimony was, I didn't believe I could be sued, which is kind of a stretch. It's what, 30 years ago he got divorced? Yeah, but if you saw the video, you'd understand. Mr. Girls could believe that. I mean, Mr. Girls is, well, anyway. But it didn't come out as to why he changed his testimony, and that's what we're complaining about. Well, the jury did hear that this is a bitter, this is they were unpleasant and how this was an unhappy divorce. Not that they're usually happy, but this was a particularly unhappy one, apparently. They heard there wasn't any contact. But in terms of why his testimony changed, that's about as much, I'd say bias and interest, whatever you want to call the term. I think my time's up, unless there's a question. It is, Mr. Rauder. You'll have an opportunity to address this again in rebuttal. Okay, now, if I'm reading this correctly, Mr. Pollard will be first. Thank you very much, Your Honor. May it please the Court, my name is Mike Pollard. Counsel. I represent John Krainink in this case. What about Mr. Rauder's point? Why couldn't you say, hey, there wasn't any of us, but someone did call and let the jury understand this in that context? The judge, well, first of all, that didn't have any impact on the outcome of the case. But it was an up or down thing according to when Mr. Wilder wanted it, and it was edited out because we were the only people left in the case, and it would have impacted prejudicially on us. It's a deposition. You're not going to have it any other way. Well, even if the jury was told that it wasn't your client's attorney that called, that would have, I mean, I don't understand. Mr. Wilder was offered an opportunity to make whatever kind of step or whatever. That was not anything that he did. The suggestion he just made now was not presented to the jury. It wasn't at the trial? All or nothing there? All or nothing. Okay, go ahead. So as a result, that wasn't there. First of all, since we're the only entity that went to trial, just briefly touch upon the nature of the trial to provide the context for which the court's going to review everything. Well, before you do that, you also said a second ago that it didn't affect the outcome in any way. Why is that? I mean, how did you come to that conclusion? Well, this is a case that had two components to it. One was what's called in asbestos parlance as a take-home bystander case. And the other was for a period of three or four months in late 1980 where Mrs. Geralds works in an office at Chinoot Air Force Base and is a bystander. So there's no direct exposure by anybody in this case. So the case was defended on three grounds. It was defended on lack of exposure. Unlike most asbestos cases, it was also defended on lack of general causation so that we had undisputed expert testimony that Mrs. Geralds' mesothelioma was idiopathic of unknown origin. And we also had specific causation. The case went on a general verdict form, which in a general verdict form it's presumed that we prevailed on all of those. And so just, for example, the question that Justice Steigman raised about the Geralds' issue, that doesn't address in any way any of the causation issues that would have affected the outcome of the case, which is why. And one of the signature failings of the counsel's argument against John Koenig is that fair to show how any of these purported errors affected the outcome of the case and were prejudicial even if they were error, which we steadfastly believe they were not. And, of course, when the court reviews all of these things, the court is reviewing them under the abuse of discretion standard such that no reasonable person could have acted the way the trial judge did in these cases. With respect to the post-exposure evidence, that was ruled on in a motion in limine and the trial court said, generally speaking, post-exposure evidence isn't going to establish what notice, knowledge, or awareness John Crane had at the period of time your client would have been warned. But if you have something that you think relates to a discrete issue, bring it up. So it said, I'm not going to foreclose it, bring it up later. That's the nature of motion in limine. When it arises later in triophany, none of these things were ever brought up again. With respect to the suggestion that the post-exposure evidence is admissible because it was required by government regulations, the Millett v. Redosta case, that's not the case here. John Crane warned in 1983, as the evidence shows, because it's customers, some of whom were government entities, because some of their customers asked them to do that. And that's why they warned, and so that didn't bring it within that. As to the safest possible, Mr. Wilder, both in his opening brief and in his reply brief, cites to one statement that the defense counsel made. If you look at those statements, they fairly address the question of causation and, as a result, they're standard things that defense lawyers say in causation cases. They did not open the door. So it's your position that we just said we didn't cause it? We defended the case on lack of general causation and lack of specific causation, and those comments went to that. And, of course, to do otherwise would be to disturb the policy of this state that encourages safety enhancement. So you certainly don't want to discourage people from putting warnings on products. This is sort of the classic example of that, and that's why the trial court properly made that ruling in respect to this case. With respect to Mr. Springs' testimony supposedly opening the door to the post-1980 evidence, it did not. That was an exchange where Mr. Wilder was questioning our client as an adverse witness. He said we did not warn until 1983, which, remember, as you are quite aware, that was the basis of the motion that counsel wanted to get that evidence in. So this person inadvertently said it on the stand, and I think any fair reading of the transcript and the colloquy that followed that is clear that the trial judge who saw what happened realized it was an inadvertent statement and it wasn't anything deliberate. He again offered Mr. Wilder the opportunity to strike that testimony, to have a curative instruction. And, of course, since plaintiff's counsel had wanted that evidence in originally and it now has come in, it declined the opportunity for any motion to strike or any. Of course, it's always a little troubling when it's a situation like this and it's your guy in the stand asking this question. He was asked this question and he gives a non-responsive answer, which opens up this argument. The question called for a yes or no, and that's not what we got. And I think the trial judge fully realized. I think plaintiff's counsel said, oh, what did he say, oh, geez, or something. Everybody realized it was inadvertent. Counsel gave him the opportunity to try and strike or request a curative instruction. How do you want to address it? And the decision was to leave it, which is not surprising because it was evidence that they had asked for earlier in the case. Again, none of that is going to, I don't think any of that changed the outcome of this case with the evidence overwhelmingly predominating both in exposure and causation in favor of my client. Lastly, since I have, I guess, about a minute left, counsel raised in his reply brief the Miller case. This is on the issue of whether Amy Model should have been questioned about monies earned by the company she works for. He talked about how this court has reduced the requirements of a formal offer of proof. That's an opinion you wrote, Justice Stegman. I didn't read that as you reducing the requirements of an informal offer. I frankly don't recall it either. Well, none was asked for in this case. Yes. A comment that I thought in the Peewell case, Mr. Rauder, which is the one I definitively wrote on offers of proof, I thought I made it real clear about how it's supposed to be a formal offer unless there's a discussion by the court indicating that an informal offer would be satisfactory. I would ask that it be a formal offer. Okay. Okay. Next is Mr. Fisher. Good morning. Good morning. Matt Fisher for Owens, Illinois. In the very few minutes that I have, I've been asked to talk about the standard that applies to the summary judgment rulings and very briefly about the case against Owens, Illinois. The standard for appellate review, of course, is de novo of the summary judgment rulings. The standard that applies substantively to the agreement element of the civil conspiracy case is clear and convincing because the plaintiff sought to prove her case on the agreement element solely through the use of circumstantial evidence. All of the summary judgment decisions that have been cited to this court, whether it be the cases cited by the plaintiffs or the cases cited by the defendants, make it very clear that the purpose of the summary judgment proceeding is to determine whether or not a fact issue exists to be decided by the fact finder at trial in that particular case. This court and trial courts around the state make that determination all the time in a variety of circumstances. They do so, as Your Honor pointed out, at the summary judgment stage, at the directed verdict stage, at the J&OB stage. They do so with regard to a variety of burdens, whether it be a preponderance burden, clear and convincing in this case, or with regard to a criminal case, beyond a reasonable doubt. Determining whether a fact issue exists is not the same as making the non-movement prove her case at the summary judgment stage. It's not the same as weighing the evidence. It's not the same as evaluating the credibility of any of the witnesses. And it's not the same as forcing the trial court to choose among inferences. It is simply the process of determining whether or not a factual issue exists for the fact finder to decide. The trial court in this case did not require the plaintiff to prove her case at the summary judgment stage. The judge did apply the substantive rules that apply to this case, including the rule that says parallel conduct by itself is not enough, including the rule that says where there is an equally likely innocent construction that may be given to conduct that is allegedly conspiratorial, the court has an obligation to choose that equally likely non-conspiratorial inference and award judgment for the defendant. That is not different than the purpose that is set forth for summary judgment, determining whether or not there's an issue for the fact finder to decide in the particular case at issue. Equally likely sounds subjective to me. Regardless, Judge, of the specific language used there, the test is to determine whether or not there is something for the fact finder to decide. Can the fact finder decide for either side? If so, it's clear that the case should be tried. If not, then the case should not be tried, and it's appropriate for summary judgment. McClure sets forth that substantive rule, and that statement of the innocent construction rule is what the trial court followed, of course, as it was. It is not a situation Judge Rozetsky was very careful here in marching through the evidence that had been offered and pointed out that each element of that evidence was either within the innocent construction rule, or was unilateral conduct, or was merely parallel conduct. So I don't think this is a case where there's a close call about what's equally likely, but that is, of course, what the McClure court has required, where the plaintiff has here chooses. Okay. Thank you, Mr. Fisher. Your time is up. We'll hear next, then, from, I guess, Mr. Simpson. Yes, Your Honor. Reagan Simpson. May it please the Court. Renewable Waybacks. Absent other questions from the Court, I'm going to focus on the claim of new evidence as to ABEX that Mr. Wilder mentioned. Before we do that, how about your thoughts about the decision from the Pennsylvania Federal Court that Mr. Wilder cited? Why shouldn't we find that to be persuasive? Judge Robrino missed an important holding, and this really is the first point I was going to mention, Justice Steigman. Missed the important, specific holding as to ABEX. When the court in Minson said, we're going to follow Rodarmal, the court in paragraph 50 quoted paragraph 124 of Rodarmal, and that same paragraph was quoted yesterday by the court in the Gillingwater case in paragraph 136. And what that paragraph says, specifically as to ABEX, and this is something that Judge Robrino either didn't follow or didn't understand, and we embrace this on rehearing with him, this is the quote, Unless ABEX had notice that the tumorous mice were scientific evidence that asbestos caused cancer, ABEX did not enter into a conspiratorial agreement. Dr. Frank cannot give this court, any jury, or anybody else, anything about what notice ABEX had in 1948. He's talking about his opinions 70 years, almost 70 years after that fact. So his testimony, whatever he says, or what any other expert might be named and come in and talk about this, that is irrelevant because the holding is what notice did ABEX have in 1948. And that's why Dr. Conson, I'm not sure they're relying on Dr. Conson's conditional testimony because it's not mentioned in the refinery that Mr. Watery mentioned today, but that's why the evidence in this case is just the same as the other cases as far as what notice ABEX had. And that notice is that in ABEX 748, the letter that came to ABEX said, Dr. Gardner didn't want to publish this, he didn't plan to do a cancer study, he's going to do a proper study later on that will take years, and he used tumor-susceptible mice. So that's the only notice that ABEX had in 1948, and the notice was that it was flawed evidence, it was flawed research. And that's exactly what this court has held, that there's nothing unlawful about deciding not to publish something that lacks scientific support. I got you off the point you were going to make that I'm also interested in hearing about, is why Mr. Wilder's argument about the new evidence isn't sustained. And that's really my lead-off point, because under the holding of this court, when this court said we're following the analysis and regard of what the opinion did, was to quote that particular paragraph, and Gillenwater quoted that paragraph too. So that's the nub of the issue as to ABEX. What notice did they have, and Dr. Frank can't supply that. As far as the substance of Dr. Frank's opinion, Judge Rob Reno didn't really pass on that. What he said there was, well, that's really a dauber issue. Whether there's any substance to what Dr. Frank has to say, that's for the trial court to decide. So we really didn't decide that issue. We argued that point, but he pointed that to, and appropriately so, to the trial court. So what I'm saying is that Judge Rob Reno missed the key holding of this court that's been repeated three times as ABEX that makes the supposed new evidence irrelevant to the notice issue. And then if we look at the substance of Dr. Frank's testimony, if you look at the common law records 7511 and 7517, which is in volume 31, Dr. Frank is saying, I can't tell what Dr. Gardner thought he had. I don't know whether it's cancer or adenomatous lesions. I can't tell. He also mentions at those same pages that you either have to know the tumor rate or you have to have controls. And neither was in this particular situation. Dr. Gardner didn't have controls. He didn't know the strength of mice. He didn't know the tumor rate. So there's no way that Dr. Frank substantively can give, and this has been in paragraph 128 of the Renormal Opinion, there's no way he can give a qualified expert opinion that the tumorous mice were a scientific evidence of a relationship between asbestos and cancer. So even if you look at the content of what Dr. Frank said, which I would submit is irrelevant because it doesn't go to the issue of notice, which is a key issue, it doesn't mean anything is not significant because he doesn't have enough information, and he mentioned at those same pages that the detailed information about the mice, I can't tell from anything that exists now. And when they say on page 7520 that he said it was scientific evidence, all he's saying is there is some statement in there by Dr. Gardner that he found to have... Counsel, I guess I've always wondered, why not just publish the findings and note that the study might be flawed? Well, a couple of things. One is, you can, if evidence isn't scientific, let's say if it's not scientific, you can either publish or not publish, but it's not unlawful to do either one because it's not scientific. If you publish non-scientific evidence, you should put the caveats in there. It's not scientific, and that's really what Dr. Frank said in pages 75, 11, 17, that you have to put all these caveats in there because we don't even know if it's cancer or not. But the point is that it's not conspiratorial, it's not unlawful not to publish. You can publish. All sorts of things are published these days that may be bogus science, and they're labeled as such. But the decision not to publish it is not unlawful, and therefore it's not a conspiratorial agreement. So the decision not to publish with the caveats that the study might be false is not evidence of a conspiracy? No, because it's not unlawful. There's nothing unlawful about saying, well, I found out that this, the researcher himself said it doesn't need to be published. He said that I need to do a better study. He said I used tumor susceptible mice. Well, let's not publish it. That's not unlawful. It wouldn't be unlawful to publish it as long as you put the caveats in. As far as Dr. Lynch, there's no evidence that Dr. Lynch's letter ever went to ABEX to be in notice, and there's nothing in either Dr. Frank's testimony or Dr. Lynch's one little letter that's ABEX 711 that says there is scientific evidence that this is valid scientific evidence. I think that's all, unless the Court has questions. Thank you. Last is Mr. Haift. Is that pronounced correctly, sir? Yes, Mr. Haift. Mr. Haift, please, the Court, Counsel. Counsel. I started with the yellow light. McClure teaches that an essential element of a conspiracy claim is proof by clear and convincing evidence of an agreement. And Guadarmo-Menz in this Court looked at evidence to see if there was such evidence that a record could conclude there was not. So the question here is whether the quote, new evidence in this case is of a different quality than that of what you saw in Guadarmo-Menz. The answer is it's not. The plaintiff only briefly touches on this new evidence on page 15 of her brief and she refers to commercial transactions, conditions in Bendix's plants, and whether or not Bendix told its employees of the problems. That is the same evidence, type of evidence that was considered in Guadarmo-Menz and held not to be clear and convincing evidence of an agreement. And the plaintiff never explains why this is anything more than either parallel conduct or conduct that could be innocently construed. So there's nothing new here. Substantively, there are a few more pieces of paper, but more of the same is just the same. So for that reason, the trial judge properly granted  consistent with Menzin, McClure, and Guadarmo. Unless there are questions for the bench, I'm... Well, why is it... Well, we're talking about a quantitative sense here. Why isn't more of the same significant? Because I think this Court in Guadarmo-Menz For example, evidence of commercial transactions between parties is not evidence of a conspiratorial agreement. So whether you have evidence of three commercial transactions or five commercial transactions, it's still commercial transactions. Evidence of whether it was asbestos in the dust in Bendix's plants, whether you have one report of asbestos in the dust or three reports, it's still only asbestos in the dust in Bendix's plants. It has nothing to do with whether Bendix agreed with someone else to say or not say something. So my point is, in response to the question, adding up more pieces of paper that prove the same point only proves the same deficient point. Thank you, counsel. Mr. Welder, rebuttal, sir? I'll try to be quick on the points because there's a number of them. ABEX is a moving target. What this Court said in Guadarmo, what you said in Menzin, without more, is you need an expert opinion. ABEX says, no, no, that's not really what you said. What you said is there has to be a notice. They had notice that the mice was evidence of cancer. That's 400-day monograph from 1943 that says it's suggestive but not conclusive. Hamlin's memorandum, which we haven't discussed just, they agree at trial and in these is a suggestion. ABEX knew there were 80 or 90 articles already that caused cancer. What you said in Guadarmo, what you said in Menzin, was you need an expert. ABEX, after saying, well, it's really not notice. Now it's notice because the problem is the plaintiff went out and got an expert. Now it says no expert could ever opine on that because it's 70 years ago. That's not what this Court said in Guadarmo and Menzin. You need a qualified expert opinion on it. We've got such an opinion, which is what Justice Regreno noticed. And in response to Justice Turner's question, it is tortious when you keep it out for your selfish reasons, for your save-your-skin reasons of Guadarmo, that the Court acknowledged was reasonable inference, keep out something that would have contributed to the medical literature. Whether it's cancer or not cancer, flawed or not flawed, Dr. Frank says at page 81 of his deposition it would have been important because it shows asbestos can cause abnormal lesions in the animals and there needs to be more investigation. That's how science grows. And Lynch in his letter says it's valuable and publishable. So this idea that there were any flaws with it, articles with flaws are valuable articles. If it's kept out to save your own skin, then that's improper. That is evidence of conspiracy. That is tortious. So I disagree with Mr. Simpson on that point. John Crane. It's been 18 months since I was at that trial, and there's been others since. But I believe it did come up that nobody was going to suggest that the attorneys, there actually was one attorney for Honeywell, and it was Mr. Heath's firm, and one paralegal who appears to be associated with OI out of Texas, paralegal-slash-attorney are the ones who left the voicemails telling Garibald's that. Nobody was suggesting they were Crane's people, and I think the discussion was we weren't going to try and argue they were Crane's people, and we didn't care if Crane said, not our people. So I don't think it's all or nothing. It was all or nothing on how the transcript was edited, but it wasn't because it was a video. So you couldn't edit it out and change the words. Did you offer a trial, what you suggested here, as an opportunity? I believe it came up and was discussed, yeah, that they could point out to the jury that it's not them, and we would not suggest it was them. The record would support that? I believe so. Now, I'll be honest, it's 18 months, Judge, and maybe I'm wrong, but that's my recollection. There was a discussion that nobody's going to say it's Crane. The 80s post-exposure, it was brought up by the corporate representative. I didn't say he was doing it on purpose, not on purpose. I did say, I think he said, well, we didn't warrant 83 OTPs. But it's out there then. But that was something helpful to you, wasn't it? Not without an explanation, and he didn't say what they warranted. Well, how is it even without an explanation? Still, it's something helpful to you to argue to the jury and suggest to the jury, look and see what happened just three years later. Well, no, actually, I couldn't argue to whatever because it was out there, and then we couldn't go back to it again because the door's not open. I can't get into it. What did you say? What do you mean you couldn't argue it? He had said it, 1983. Why couldn't you argue what he had said? Because there was an order in limine about references to the orders, and the door had not been opened. And that's what I said. The door had been opened. And I should be able to say they're saying this stuff causes disease while they're standing up and opening and saying it's incapable of causing disease. And Counselor Day said, well, that's what defense attorneys say. I don't know of the controlling authority that that means anything just because they say it. So offer proof as a model. I didn't discuss it. Might be a reason why they chose not to argue it today. I'll stand on my brief. And then as to summary judgment, Mr. Fisher, at one point he says, the court has to choose between the inferences. And it's, I thought, always been the law in summary judgment. Trial courts don't choose anything other than the inference beneficial to the non-movement. They don't weigh the evidence. And that's what, if you put this innocent construction, clear and convincing thing, into the summary judgment stage where the court chooses the right inference among competing inferences, in effect the court is trying or is weighing the evidence. And it is subjective. And that's what we leave to the jurors. And then it's reviewed afterwards at the directed verdict stage. So we'd ask you to vacate the summary judgments. We'd ask you to give us a new trial. There's no questions. Thank you, counsel. And given that you were four against one, you did just fine, Mr. Welder. Well, thank you, Spada, and advise if you need reasons.